UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | ) Case No. CR408-368 |
| | ) |
| MICHAEL ANTHONY GRANT, and | ) |
| STACY MAURICE BENTON, | ) |
| | ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

On August 21, 2008, Drug Enforcement Administration ("DEA") agents enlisted the services of the Gwinnett County Sheriff's Department to stop and search a vehicle occupied by defendants Grant and Benton, who were traveling on Interstate 85 in Atlanta. The officers found 9 kilograms of cocaine and two firearms hidden in the vehicle. Defendants move to suppress that evidence. (Docs. 27, 34, & 42.) For the following reasons, defendants' motions should be **DENIED**.

I.  **FACTS**

In June 2008 a confidential informant approached Special Agent Gregory Malloy (an 18-year DEA veteran) with information about an apartment in Norcross, Georgia that was regularly being used to conduct large drug transactions. The informant, who had ready access to the apartment, furnished detailed information about these drug sales, indicating that various purchasers would drive to the apartment, load drugs into their vehicles, and then depart with their cargo. Based on information furnished by the informant, in early July DEA agents arranged to have a Gwinnett County Sheriff's deputy conduct a traffic stop of a vehicle shortly after it left the apartment. The deputy sheriff seized 4 kilograms of cocaine during that stop. A week later, the informant related that certain individuals were in the process of purchasing a large amount of marijuana at the apartment. Again, the DEA agents had a Gwinnett County deputy stop and search the vehicle after it left the apartment. On this occasion, the deputy seized some 20 pounds of marijuana.[1]

---

[1] Both the July seizures resulted in state criminal charges that are still pending in the Atlanta area.

On August 21, 2008, the informant contacted Special Agent Malloy and reported that two individuals from out of town were scheduled to purchase 9 kilograms of cocaine at the apartment later that day. Agent Malloy placed agents in the area, but because of the layout of the apartment complex, he could not put any agents within the apartment's line of sight without giving away the operation. He relied upon the informant for updates from inside the apartment. Agents spotted a red Mercury Cougar arrive at the apartment complex that afternoon. Moments later, the informant notified Agent Malloy that the defendants had arrived, driving a red Mercury Cougar. Through both telephone calls and text messaging, the informant advised Malloy that defendants were leaving the apartment to purchase a screwdriver. The agents spotted defendants as they left the apartment complex and tailed the Cougar to a nearby Home Depot. Benton entered the store briefly and then exited carrying bags marked with the store's logo. After the agents followed the car back to the apartment complex, the informant soon notified Agent Malloy that the defendants had returned to the apartment and had purchased the 9 kilos of cocaine. He further indicated that the individuals were

"messing around" in the back seat of their vehicle, presumably concealing the cocaine. Soon thereafter, the Cougar left the apartment complex.

Agent Malloy contacted Deputy Cotton of the Gwinnett County Sheriff's Department, informed him that cocaine had been loaded into the Cougar, and asked him to stop the car. He told Cotton to look for "independent probable cause" for stopping the vehicle in an effort to protect the informant's identity and ongoing DEA investigation. Noting that the Cougar had dark-tinted side windows, Deputy Cotton stopped the car and advised the driver (Grant) that he had been stopped for having excessively tinted windows in violation of the Georgia traffic code.[2] Grant was unable to produce a driver's license. Deputy Cotton then inquired whether there were any drugs inside the vehicle. When told that there were none, he asked for consent to search the car. After receiving consent from both the driver and passenger, Deputy Cotton removed the rear speaker covers, noted that the screws holding the

---

[2] O.C.G.A. § 40-8-73.1(b)(2) ("Except as provided in this Code section, it shall be unlawful for any person to operate a motor vehicle in this state . . . [w]hich has material and glazing applied or affixed to the . . . side or door windows, which material and glazing when so applied or affixed reduce light transmission through the . . . window to less than 32 percent, plus or minus 3 percent. . .").

4

speakers in place were mismatched, and noticed some tool marks on the screws. Removing the speakers, he recovered the 9 kilograms of cocaine and two pistols.

## II. ANALYSIS

Defendants contend that the stop and search of their vehicle was unreasonable within the meaning of the Fourth Amendment, thus requiring the suppression of the drugs, guns, and other evidence[3] seized by Deputy Cotton. (Docs. 27, 34, & 42.) This contention is utterly meritless, for the evidence adduced at the suppression hearing establishes that the law enforcement officials had multiple, independent grounds for stopping and searching their vehicle. Based upon information from a trusted informant of proven reliability and their own elaborate surveillance that corroborated many important details of the informant's information, the DEA agents had *compelling* evidence — far in excess of the probable cause threshold — that defendants were transporting a large shipment of cocaine in their vehicle. The exigencies of that situation justified the warrantless stop and search of their vehicle. Further, the sheriff's deputy developed

---

[3] Defendants also move to suppress the nearly $10,500 in currency seized from their persons following the arrest. (Docs. 27, 34, & 42.)

5

additional probable cause to stop the vehicle for violating the Georgia traffic laws. His subsequent search of that vehicle based upon defendants' consent was entirely permissible.

This case is remarkable for the quality of the informant information available to the DEA investigators. The informant related that he had first-hand information that large amounts of drugs were being distributed from inside a particular apartment. The agents began to watch the apartment and confirmed that the informant had detailed knowledge about its occupants and visitors. During the month preceding the events in this case, the informant notified the agents on two occasions that drugs had just been purchased at the apartment and loaded into vehicles. On both occasions, the agents had the vehicles stopped and searched by a local sheriff's deputy, who discovered large amounts of drugs concealed in the vehicles. The agents, therefore, had every reason to trust their informant when he reported that yet another large drug transaction was scheduled for August 21, 2008. "Courts have consistently held that an informant's track record is sufficiently established by a showing (i) that on one or more prior occasions the informant indicated that . . . narcotics . . . are concealed at a certain

6

place, and (ii) that this information was verified as true by a search which uncovered the specific items at the place indicated." 2 WAYNE R. LAFAVE, ET AL., SEARCH AND SEIZURE § 3.3(b) (4th ed. 2009).

When the informant notified the agents that drug couriers were coming to purchase cocaine on August 21, they immediately set up surveillance around the apartment complex. From inside the apartment, the informant continually fed the agents detailed information about arrival and departure of a particular vehicle and updated them about the progress of the drug deal. The informant reported that the defendants were driving in a red Mercury Cougar. The agents spotted such a vehicle enter the apartment complex. When the informant said that defendants needed a screwdriver and were about to travel to a local hardware store to purchase one, the agents tailed the Cougar to just such a store and saw one of the defendants enter and make a purchase. The informant's ability to predict what the suspects were about to do enhanced the reliability of his information. *Id.* at §§ 3.3(d), (e), & (f) (noting that in evaluating probable cause courts traditionally give great weight to detailed first-hand information

that agents corroborate through surveillance or other investigative techniques).

"'The Fourth Amendment protects individuals from unreasonable search and seizure.'" *United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003) (quoting *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001)). A warrantless stop and search of a vehicle is reasonable when an officer has probable cause to believe that the vehicle contains contraband and there are exigent circumstances which necessitate an immediate search. *United States v. Forker*, 928 F.2d 365, 368 (11th Cir. 1991); *United States v. Parrado*, 911 F.2d 1567, 1571 (11th Cir. 1990); *United States v. Alexander*, 835 F.2d 1406, 1409 (11th Cir. 1988). Here, the agents had clear probable cause to believe that the red Mercury Cougar driven by defendants was laden with drugs, for a reliable informant with personal knowledge of the facts so advised the agents, who confirmed various details of the informant's information through their own careful surveillance. They were entitled not only to stop that vehicle but to search it as well, for the "inherent mobility" of a vehicle furnishes the necessary "exigency" to justify its warrantless search. *Forker*, 928 F.2d at 368; *Parrado*, 911 F.2d at 1571; *Alexander*,

8

835 F.2d at 1408-09; *see United States v. Nixon*, 918 F.2d 895, 903 (11th Cir. 1990) ("the requirement of exigent circumstances is satisfied by the 'ready mobility' *inherent* in all automobiles that reasonably appear to be capable of functioning") (emphasis in original).

Defendant Benton disputes any finding of exigency, arguing that the car's keys were in the possession of the arresting officers, so the vehicle was not mobile. (Doc. 27 at 3.) The Eleventh Circuit has foreclosed such an argument. *See United States v. Birdsong*, 982 F.2d 481, 483 (11th Cir. 1993) ("once law enforcement officers have probable cause to conduct a warrantless search of a vehicle, the officers may conduct the warrantless search even after the vehicle is impounded and in police custody"); *Parrado*, 911 F.2d at 1571; *United States v. Odom*, 2008 WL 4693331 at *4 (S.D. Fla. Sept. 11, 2008) ("the justification to conduct a warrantless search 'does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.'"). Since there was probable cause to believe that the vehicle contained

contraband, and since the ready mobility of the vehicle furnished sufficient exigent circumstances, the agents were entitled to enlist the services of Deputy Cotton to both stop and search the vehicle.[4]

Deputy Cotton also had an independent basis for stopping the vehicle, for he had probable cause to believe that a traffic offense had occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996) ("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"); *United States v. Hamilton*, 299 F. App'x 878, 882 (11th Cir. 2008); *Chanthasouxat*, 342 F.3d at 1275. Deputy Cotton noted that the Cougar's windows were so darkly tinted that they appeared to violate O.C.G.A. § 40-8-73.1, which requires that 32 percent of visible light (plus or minus 3 percent) must be able pass through the passenger and driver-side windows of vehicles traveling on the Georgia highways. A tint meter later confirmed that only 29 percent of light passed through the windows of defendants' vehicle. While defendants argue that their windows were within the 3 percent variation permitted under state law,

---

[4] Even if Deputy Cotton was not aware of every fact known by Agent Malloy, he still was entitled to rely upon Agent Malloy's probable cause determination. *United States v. Astling*, 733 F.2d 1446, 1460 (11th Cir. 1984) ("the collective knowledge of the officers determines probable cause").

the fact that the tint was darker than the allowable 32 percent gave Cotton ample reason to stop the defendants' vehicle. After all, probable cause does not require certainty that a criminal offense has actually been committed. Instead, it "exists where the facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed. . . ." *United States v. Allison*, 953 F.2d 1346, 1350 (11th Cir. 1992); *see also United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1222 (11th Cir. 1992); *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992). Defendants did not offer any testimony or evidence indicating that it was plainly apparent that no traffic violation had occurred or that Cotton had no reasonable grounds for his belief that the vehicles' windows were too darkly tinted. Deputy Cotton's traffic stop thus was reasonable, whether or not the ultimate outcome of a tint meter check would have actually supported a window-tint conviction.[5]

---

[5] Defendants' counsel invites the Court to apply the "beyond a reasonable doubt" standard to determine whether a tint violation actually occurred. That is not the standard here, however. The Court need only determine whether Deputy Cotton had probable cause to believe that the windows were illegally tinted, and the tint meter results clearly support his belief as reasonable under the circumstances. Moreover, probable cause to believe that a traffic violation was occurring was

11

The search of the vehicle following the traffic stop was permissible based upon defendants' consent. An officer may request consent to search a vehicle during the course of a routine traffic stop. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001). In order for consent to be valid, it must be voluntary — that is, it must be the product of a free and unconstrained choice. *Schneckloth*, 412 U.S. at 227. Here Deputy Cotton testified that he used no threats or inducements of any kind in gaining defendants' consent. He also indicated that defendants both appeared sober and well-rested, and that they were unrestrained when they gave their consent. Defendants have not offered any evidence rebutting the government's showing that their consent to search was freely and voluntarily given.

---

sufficient to effectuate the stop regardless of Cotton's underlying motive to stop the vehicle because the DEA agents believed it was transporting drugs. *Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

## III. CONCLUSION

For all of the reasons explained above, defendants' motions to suppress should be **DENIED**.

**SO REPORTED AND RECOMMENDED** this ___10th___ day of August, 2009.

                                                          /s/ G.R. SMITH
                                                          UNITED STATES MAGISTRATE JUDGE
                                                          SOUTHERN DISTRICT OF GEORGIA